740 So.2d 1100 (1999)
Richard HOPLAMAZIAN
v.
Judith B. HOPLAMAZIAN.
2970791.
Court of Civil Appeals of Alabama.
April 9, 1999.
Rehearing Denied May 28, 1999.
Certiorari Denied August 27, 1999.
*1101 Fulton S. Hamilton of Hamilton & Gardner, Huntsville, for appellant.
Dinah P. Rhodes of Lammons, Bell & Rhodes, Huntsville, for appellee.
Alabama Supreme Court 1981488.
PER CURIAM.
Richard Hoplamazian and his wife Judith B. Hoplamazian were divorced in 1995. They were given joint custody of their six-month-old son, with the mother having primary physical custody. The father was ordered to pay $546 per month in child support. In 1997, the father filed a petition to modify, seeking full custody. The mother counterclaimed for an increase in child support, reduced visitation by the father, and an attorney fee. Following an ore tenus proceeding, the trial court denied the relief requested by the father and granted, in part, the relief requested by the mother. The court increased the father's child-support obligation to $705.95 per month and awarded the mother an attorney fee of $11,927.51. The father appeals.

*1102 I.
The father contends that the trial court erred by applying the standard of Ex parte McLendon, 455 So.2d 863 (Ala.1984), rather than the "best interest" standard, to the modification proceeding. We hold that the circuit court applied the correct standard of proof.
"Where the parties agree to joint legal custody and shared physical custody of the children without a judicial determination preferring either parent, `custody [is] appropriately determined by the trial court according to what [is] in the `best interest' of the children.' Ex parte Couch, 521 So.2d 987, 989 (Ala.1988). However, where the parents have joint legal custody, but a previous judicial determination grants primary custody to one parent and secondary custody to the other, `the trial court [is] correct in applying the McLendon standard and requiring the [parent] to show that a change in custody would materially promote the welfare and best interests of the child, offsetting the disruptive effect of uprooting the child.' Blackmon v. Scott, 622 So.2d 393, 394 (Ala.Civ.App. 1993)."
Scholl v. Parsons, 655 So.2d 1060, 1062 (Ala.Civ.App.1995). See also Ex parte Johnson, 673 So.2d 410 (Ala.1994) (holding that "[i]f one parent has previously been granted primary physical custody," then McLendon applies); Berrey v. Berrey, 622 So.2d 1316 (Ala.Civ.App.1993) (holding that when the father and mother shared joint custody, but the child's "primary residence" was to be with the mother, McLendon applied); Taylor v. Taylor, 563 So.2d 1049, 1051 (Ala.Civ.App.1990) (holding that when the mother was given "primary physical custody," McLendon applied); Jenkins v. Jenkins, 541 So.2d 19 (Ala.Civ. App.1989) (holding that when the parties had joint custody but the mother provided the "primary residence" for the children, McLendon applied).

II.
The father argues that the trial court erred by failing to order an independent custody evaluation by a neutral mental-health professional. We disagree.
The trial court heard testimony from four licensed psychologiststwo for the father (Dr. Roger Rinn and Dr. Frankie L. Preston), and two for the mother (Dr. Joan Kerr and Dr. Katherine Allen); two licensed professional counselors (Roger Hunter and James F. Pierce, both for the father); and two pediatricians (Dr. Judy Isenberg for the father, and Dr. N. Rao Thotakura for the mother). In addition, the trial judge was the same judge who had conducted the parties' divorce proceedings; during those proceedings the parties had submitted to psychological evaluations performed by Dr. Roger Rinn. At trial, Dr. Rinn repeated the results of his earlier evaluations of the parties and gave his opinion of their fitness to parent.
The trial court could reasonably conclude that additional court-ordered evaluations would have been superfluous and dilatory. The father filed his request for an independent evaluation less than 30 days before trial, after the case had been pending for over 9 months. "Whether to grant a request for psychological evaluations is a matter which rests within the discretion of the trial court. Perry v. Perry, 460 So.2d 1324 (Ala.Civ.App.1984)." Crosslin v. Crosslin, 494 So.2d 431, 433 (Ala.Civ.App.1986). We find no abuse of discretion.

III.
The father claims that the trial court abused its discretion by continuing primary physical custody of the child with the mother. The father's request for a custody modification was based on his theory that the mother babied and overprotected the son, who was, at the time of trial, slightly more than three and one-half years old.
*1103 To support his theory, the father presented evidence indicating that when the son was with the mother, he was not able to use the toilet, occasionally slept in the mother's bed and was breast-fed, and suffered from a gastrointestinal disorder. The father also presented evidence tending to show that the boy's speech was developmentally delayed. The father testified that when the son was with him, the boy was able to use the toilet, showed no interest in nursing, and suffered from no stomach ailments. The father offered evidence from mental-health experts indicating that it was abnormal, and perhaps developmentally detrimental, for a child older than three years to be breast-fed and not to be toilet trained.
The mother presented evidence tending to show that the child's tardiness in weaning and toilet training, as well as his sleep disorder and nightmares, could be traced, in part, to his conflicts about visitation with the father. The mother explained that usually the child slept in his own bed but that, when the child had episodes of night waking or nightmares (episodes which, she testified, often occurred after the child returned from visitation with the father), she would put him in bed with her and nurse him to comfort him. Pediatric and mental-health experts called by the mother gave their opinions that the mother's nursing the child on those occasions was not developmentally detrimental. Furthermore, the mother's experts gave their opinions that she was an excellent parent and that removing the child from her primary custody would have a negative effect on the child.
When a trial court makes a custody determination following an ore tenus proceeding, its judgment based on the evidence presented in that proceeding is presumed correct and will not be reversed on appeal unless it is so unsupported by the evidence as to be plainly and palpably wrong. See Glover v. Glover, 678 So.2d 174, 178 (Ala.Civ.App.1996). A parent seeking a modification of custody must show that he or she is fit and that the change of custody would materially promote the child's best interests and welfare. Ex parte McLendon, 455 So.2d 863, 865-66 (Ala.1984).
In order to justify a modification of custody, "[t]he evidence must be so substantial as to disclose an obvious and overwhelming necessity for a change. This requires a showing that the positive good brought about by the change of custody will more than offset the inherently disruptive effect caused by uprooting the child." Klapal v. Brannon, 610 So.2d 1167, 1169 (Ala.Civ.App.1992) (citations omitted). After reviewing the evidence and applying the appropriate presumptions, we hold that the trial court's denial of the father's request for a custody modification was not an abuse of discretion. The father did not present evidence "so substantial as to disclose an obvious and overwhelming necessity for a change." Klapal, 610 So.2d at 1169.

IV.
The father maintains that the trial court abused its discretion by requiring the child to continue in counseling with psychologist Dr. Joan Kerr because Dr. Kerr was, he claims, biased against him and likely to damage his relationship with his son. The father submitted affidavits from psychologists Dr. Frankie Preston and Dr. Roger Rinn in support of his post-judgment motion to remove the requirement that the child be counselled by Dr. Kerr and to substitute a new therapist who had had no prior dealings with either party or with the child.
Dr. Kerr testified that she first saw the child for counselling when he was two years, eight months old. At the time of trial, she had been counselling him for a little over a year. According to Dr. Kerr, the mother brought the child for counselling because he had had nightmares and other sleep disturbances after returning from visitation with the father. The mother *1104 told Dr. Kerr that "her goal throughout [the child's] therapy" was "to facilitate [his] adjustment to the visitation," to have the child say, "I want to go see my daddy." Dr. Kerr testified that she provided the mother with suggestions about how "to maximize [the child's] willingness to go [for visitation] with his father, [and] to decrease his anxiety about going and coming back."
Based on the established therapeutic relationship between the child and Dr. Kerr and on Dr. Kerr's testimony regarding the goal of therapy, the trial court was authorized to discount the father's claims of bias and to conclude that continued counselling with Dr. Kerr was in the child's best interest. The issues of visitation and counselling of a minor child are within the sound discretion of the trial court, and the court's determination will not be reversed in the absence of an abuse of that discretion. See Foster v. Foster, 409 So.2d 833, 836 (Ala.Civ.App.1981). We find no abuse here.

V.
The father argues that the trial court erred in its application of the Child Support Guidelines, specifically Rules 32(B)(5) and 32(B)(8), Ala. R. Jud. Admin., by imputing income to the mother and by adding work-related child-care costs to the basic child-support obligation. Rule 32(B)(5) states:
"If the court finds that either parent is voluntarily unemployed or underemployed, it shall estimate the income that parent would otherwise have and shall impute to that parent that income; the court shall calculate child support based on that parent's imputed income. In determining the amount of income to be imputed to a parent who is unemployed or underemployed, the court shall determine the employment potential and probable earning level of that parent, based on that parent's recent work history, education, and occupational qualifications, and on the prevailing job opportunities and earning levels in the community. The court may, in its discretion, take into account the presence of a young or physically or mentally disabled child necessitating the parent's need to stay in the home and therefore the inability to work."
(Emphasis added.)
The trial court had before it evidence that the mother considered herself a full-time, stay-at-home mother, that she had not been employed since 1992, that she had not sought employment since the birth of the child, and that she had no plans to seek employment. She stipulated at trial that an annual income of $26,000 could be imputed to her based on her average salary the last year of her actual employment. The father presented no evidence suggesting that the $26,000 figure was inaccurate. Based on this evidence and the portion of Rule 32(B)(5) emphasized above, the trial court was authorizedbut not requiredto impute an income to the mother. See Romano v. Romano, 703 So.2d 374, 376 (Ala.Civ.App. 1997) (holding that the trial court did not abuse its discretion by imputing income to an unemployed mother); Doyle v. Doyle, 579 So.2d 651, 653 (Ala.Civ.App.1991) (holding that the trial did not abuse its discretion by failing to impute income to a stay-at-home mother). Although we reject the father's argument that the court abused its discretion by imputing income to the mother, we believe there is merit to his contention that the court erred by adding work-related child-care costs to the basic child-support obligation.
Under our guidelines, the total child-support obligation is divided between the parents in proportion to their respective incomes. See Rule 32(C)(2), Ala. R. Jud. Admin. The first step in calculating a child-support order is to determine the monthly gross income of each parent. See id. The trial court determined that the father's monthly gross income was $4,833.34, and that the mother's potential, *1105 or imputed, monthly gross income was $2,166.67. Adding the father's income and the mother's imputed income resulted in a basic child-support obligation of $835, to which the trial court then added $160 in health-insurance costs and $260 in work-related child-care costs. From the sum of those three amounts ($1,255.00), the trial court calculated that the father's proportional share of the child-support obligation was $865.95. The court then subtracted $160, representing the required adjustment for the father's payment of the child's health-insurance costs, and arrived at the amount of child support the father was ordered to pay in this case$705.95. The child-support calculation is best illustrated as follows:

 Mother Father Combined
Monthly Adjusted Gross Income 2,166.67 4,833.34 7,000.01
Percentage Share of Income 31% 69%
Basic Child-Support Obligation 835.00
Work-related Child-Care Costs + 260.00
Health Insurance Costs + 160.00
 ________
Total Child-Support Obligation 1,255.00
Each Parent's Child-Support Obligation 865.95
Adjustment for Payment of Health Insurance -160.00
 ________
Recommended Child-Support Order 705.95

We hold that the trial court erred by adding $260 in work-related child-care costs to the basic child-support obligation. Although this issue has not yet been addressed by our appellate courts, the decisions of other states with similar child-support guidelines support our holding. See, e.g., In re Marriage of Mackey, 940 P.2d 1112 (Colo.Ct.App.1997). In Mackey, the Colorado Court of Appeals held that a court should not consider the cost of child care when imputing income to a stay-athome custodial mother. The court stated:
"To require the obligor to be responsible for costs that are not actually incurred and which are speculative in nature seems patently unfair. The purpose of the [child support] Guidelines is to assess responsibility for costs actually incurred on behalf of the children in order to adequately address the children's needs. When the custodial parent becomes employed and pays for work-related child care costs then the child support order can be modified."
940 P.2d at 1115. This court's opinion in Vlahos v. Ware, 690 So.2d 407 (Ala.Civ. App.1997), is not to the contrary. In Vlahos, the issue was whether work-related child-care costs could reduce the amount of income imputed to a unemployed mother.
This court decided that, while the mother was not entitled to have her imputed income reduced by the amount she says she was spending for child care, she was entitled to have child-care expenses considered as one factor in the child-support calculation. Here, the issue is not whether childcare expense can reduce an unemployed mother's imputed income, but whether some fictional expense an unemployed mother might have had if she had been working can increase the father's child-support obligation. We hold that it cannot.
Rule 32(B)(8), Ala. R. Jud. Admin., states, in pertinent part:
"Child care costs, incurred on behalf of the children because of employment or job search of either parent, shall be added to the `basic child support obligation.'"
The mother has obviously not "incurred [child care] costs because of employment or job search." To impute such a cost to her, when the result would increase the father's support obligation, is patently unfair.

VI.
The father contends that the trial court erred by awarding the mother an *1106 attorney fee. He argues that, because the mother's parents paid the attorney fee as a gift to their daughter and did not expect to be reimbursed, the mother had no legal obligation to pay her lawyer or to repay her parents. Therefore, the father asserts, the attorney-fee award was a windfall to the mother and a penalty to him.
The mother testified that her attorney's bill for services and expenses was $11,927.51. She stated that she had borrowed the money from her parents to pay the bill and that she had no means by which to repay her parents. On cross-examination, the mother admitted that her father had paid her attorney fee in full and that she had not talked with her parents about repayment.
The law is well settled that the award of an attorney fee is within the sound discretion of the trial court. Boykin v. Boykin, 628 So.2d 949 (Ala.Civ.App. 1993). The factors to be considered in awarding an attorney fee include the earning capacity of the parties, the results of the litigation, and the financial circumstances of the parties. Brasfield v. Brasfield, 679 So.2d 1091 (Ala.Civ.App.1996). There is no law in Alabama that would prohibit the trial court from awarding a spouse an attorney fee that had initially been made by his or her parents because of the financial hardship it would cause the spouse. It appears to us to be one more factor the trial court could take into account when determining whether to award an attorney fee.
The father initiated this suit, requesting that the trial court modify the original divorce judgment and award him custody of the child. The record shows that at the time of the modification hearing, the father was earning $58,000 annually. The mother was unemployed, but her earning capacity was valued at about half that of the father's. Based on the record before us, we cannot say that the trial court abused its discretion in awarding the wife an attorney fee.
The provisions of the judgment relating to custody and visitation and the award of an attorney fee to the mother are affirmed. The provision relating to child support is reversed. The cause is remanded with directions to recalculate the child support due.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH DIRECTIONS.
ROBERTSON, P.J., and YATES, MONROE, and THOMPSON, JJ., concur.
CRAWLEY, J., concurs in part and dissents in part.
CRAWLEY, Judge, concurring in part and dissenting in part.
I concur in all parts of the court's opinion except for the affirmance of the attorney fee award.
The mother's father testified that the mother and the son had lived with him and his wife since the parties' divorce. The mother's father stated that he and his wife had given the mother between $400 and $500 per month for living expenses. In addition, he said that they had paid for her automobile and continued to pay for its maintenance and insurance. When asked whether he had provided any other financial assistance to the mother, the mother's father stated that he had paid some of her medical bills. He explained his financial contributions to the mother by stating, "[W]hatever [the mother] requires, we provide. It is really just that simple." When asked whether he expected repayment for any of the money he had given the mother, he replied, "Absolutely not." When questioned about whether he expected the mother to repay the amount he had paid to her attorney, the mother's father answered, "Not really."
"The granting of attorney's fees is a matter exclusively for the discretion of the trial court and is not mandatory; however, an award is subject to review by an appellate court." P. Davis & R. McCurley, *1107 Alabama Divorce, Alimony and Child Custody Hornbook § 14-1 at 141 (3d ed.1993). "[T]his court has repeatedly held that, in a case in which the husband unsuccessfully brings a modification petition... the wife may be entitled to the attorney fees she incurs by having to defend herself." Waltman v. Waltman, 480 So.2d 594, 598 (Ala.Civ.App.1985). The key word in the foregoing sentence is "incurs." Has the mother "incurred an attorney fee" when her parents have paid the fee and do not expect reimbursement from her?
That issue does not appear to have been addressed by the appellate courts of Alabama, and the few decisions from other jurisdictions are not uniform. In Thorne v. Thorne, 66 A.D.2d 397, 414 N.Y.S.2d 1 (1979), the New York court held that there could be no attorney-fee award to a wife whose parents had paid the fee, because the wife was not the real party in interest with regard to the payment. In Fendler v. Thorne, 83 A.D.2d 803, 804, 441 N.Y.S.2d 685, 686 (1981), a companion case to Thorne v. Thorne, supra, the court decided that the wife's parents "would have to sue [the husband in the divorce case] in their own names for recovery of [the attorney fee]."
In In re Marriage of Magnuson, 156 Ill.App.3d 691, 510 N.E.2d 437, 109 Ill.Dec. 569, appeal denied, 116 Ill.2d 556, 515 N.E.2d 111, 113 Ill.Dec. 302 (1987) (table), the Illinois court reversed an attorney-fee award against the former husband in a divorce case because the former wife was not personally liable for the fee. Construing an Illinois statute providing for an attorney-fee award against one spouse in a divorce case if the fee was "necessarily incurred" by the other spouse, the Magnuson court held that the phrase "necessarily incurred" requires a spouse to be "personally liable for such fees before the other spouse can be required to pay them." 156 Ill.App.3d at 700, 510 N.E.2d at 443, 109 Ill.Dec. at 575.
In contrast, the Colorado Court of Appeals, in In re Marriage of Swink, 807 P.2d 1245 (Colo.App.1991), reversed a trial court's order that denied the wife an attorney fee because she was not personally liable for paying it. In Swink, the lawyer had rendered pro bono services. The Colorado appellate court determined that allowing attorney fees to lawyers
"who provide pro bono services to the economically disadvantaged tends, as a matter of economic reality, to encourage greater lawyer participation in such activities and that such practice should be encouraged as a matter of public policy."
807 P.2d at 1247. See also Beeson v. Christian, 594 N.E.2d 441 (Ind.1992).
In Beeson, the Indiana court affirmed a trial court's order that the former husband pay the former wife's attorney fees, even though the former wife "was not legally obligated to pay those fees." 594 N.E.2d at 442. The court held that the "public policy [of equal access to the courts] would be undermined if we were to hold that a party must be personally obligated to pay attorney fees before the trial court could order the other party to pay those fees." 594 N.E.2d at 443.
The public policy considerations underlying the Swink and Beeson cases are not present in this case. Disallowing an attorney fee to the mother here does not deny equal access to the courts or discourage lawyers from rendering pro bono services. I recognize that it may seem inequitable to penalize the mother's parents for what appears to be their open-ended generosity to their daughter. On the other hand, I also recognize that the testimony of the mother's father indicates that he intended to make a gift to his daughter by paying her attorney fee. I am persuaded by what I believe are the better-reasoned decisions from other jurisdictions that disallow an attorney-fee award against one spouse unless the other spouse is legally obligated to pay the fee. Because the mother was not legally obligated to pay the fee here, I *1108 would instruct the trial court, on remand, to vacate the attorney-fee award.